RECEIVED
IN ALEXANDRIA, LA

DEC 15 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

KAY MARGARET HAWKES,　　　　　CIVIL ACTION
　　　Appellant　　　　　　　　　NO. CV08-0247-A

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER　　JUDGE JAMES T. TRIMBLE
OF SOCIAL SECURITY,　　　　　　　MAGISTRATE JUDGE JAMES D. KIRK
　　　Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

On April 3, 2006, Kay Margaret Hawkes ("Hawkes") filed an application for a period of disability and disability insurance benefits ("DIB") (Tr. pp. 12, 48), alleging a disability onset date of August 20, 1985.[1]  Hawkes filed an application for dependent child's benefits on March 21, 2007, on the social security record of her deceased father, Cleave G. Hawkes, alleging a disability onset date of March 9, 1965, her date of birth (Tr. p. 51).  Those applications were denied by the Social Security Administration ("SSA") (Tr. p. 42, 45).

A de novo hearing was held before an administrative law judge ("ALJ") on July 16, 2007, at which Hawkes appeared with her

---

[1] Hawkes filed a prior application for DIB on July 15, 1984, alleging a disability onset date of December 31, 1983, which was denied (Tr. p. 48).  Hawkes also filed an application for Supplemental Security Income ("SSI") on April 3, 2006, alleging a disability onset date of August 20, 1985 (Tr. p. 209); that application was denied because her monthly unearned income from an annuity exceeds the maximum amount payable for SSI (Tr. pp. 210, 212-219).

attorney, three witnesses, and a vocational expert ("VE"). The ALJ found that Hawkes had disability insured status through June 30, 1984, her past relevant work as a sitter (prior to age 22) was not subsidized, she had "medically determinable impairments" of atypical psychosis and borderline intellectual functioning prior to age 22 and prior to her date last insured, but she did not have any severe impairments or a severe combination of impairments that "significantly limited her ability to perform work-related activities for twelve consecutive months" and, therefore, was not under a disability as defined in the Social Security Act before the attained age 22 (for DAC benefits), or on or before the date she last had disability insured status, June 30, 1984 (for DIB) (Tr. pp. 12-18).

Hawkes requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 3), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Hawkes next filed this appeal for judicial review of the Commissioner's final decision. On appeal, Hawkes contends the ALJ committed reversible error by (1) failing to find that Hawkes suffered from a severe impairment prior to age 22, despite her atypical psychosis, borderline intellectual functioning, and valid IQ scores of 71 verbal IQ, 79 performance IQ, and 72 full scale IQ, (2) failing to give weight to the collateral source evidence of her seizure disorder, and (3) finding her atypical psychosis was not "severe" for a period of twelve continuous months during the

relevant time period.

Both Hawkes and the Commissioner filed briefs. Hawkes' appeal is now before the court for disposition.

<u>Eligibility for Benefits</u>

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

A child of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, is entitled to insurance benefits is the child (1) has filed an application for child's insurance benefits, (2) at the time such application was filed was unmarried and (a) either had not attained age 18 or was a full-time elementary or secondary school student and had not attained age 19, or (b) is under a disability which began before he attained age 22, and (3) was dependent on the insured individual (a) when the application was filed if the individual is living, (b) at the time

of the individual's death, (c) or at the beginning of the individual's period of disability or the time he became entitled to benefits. 42 U.S.C. § 402(d). Section 402(d) is implemented by 20 C.F.R. 350. Section 350 states that a claimant is entitled to child's benefits on the earnings record of an insured person, who is entitled to old-age or disability benefits or who has died, if the claimant (1) is the insured person's child, (2) is dependent on the insured, (3) applies, (4) is unmarried, and (5) is under age 18, or is 18 years old or older and has a disability that began before age 22, or is a full-time student as described in Section 404.367. 20 C.F.R. § 404.350. Pursuant to 42 U.S.C. § 402(d) and 20 C.F.R. § 404.367, a child is eligible for benefits if he/she is a full time student in elementary or secondary school who is under age 19.

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not

involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### Summary of Pertinent Facts

#### 1. Medical Records

According to a medical report by Dr. Babson Fresh, Hawkes' neurosurgeon, Hawkes began having seizures as a baby, with a near-fatal episode at school in the third grade (Tr. p. 163). Hawkes

was learning impaired because of her frequent seizures and attended special education classes (Tr. p. 163). Hawkes finished high school in 1979 at age 24 (Tr. p. 163). According to the Concordia Parish School Board, Hawkes attended school there from 1962 through 1975, but they did not have records of her special education evaluation because those records were destroyed every ten years (Tr. p. 143). Hawkes' elementary school/junior high report card shows she failed the first grade in 1961-1962 (having missed 41 days of school), failed the second grade in 1963-1964, received a "social promotion" to the next grade in 1966, and was placed in special education classes beginning in 1967 (Tr. pp. 144-145). Hawkes was noted, on her school record, to have an IQ of 87 on the Kuhlman-Anderson test and an IQ Of 79 on the Otis Mental Ability test (the dates those tests were administered are not given) (Tr. p. 144). Hawkes completed elementary school/junior high in 1975 (Tr. p. 145).

In August 1983, Hawkes, then 28 years old, was admitted for in-patient mental health care by her family, who alleged she was upset, crying constantly, and had a history of psychiatric illness which was being followed by a psychiatrist and treated with Mellaril (Tr. p. 204). Dr. Pushkalai Pillai, a physician employed at the mental hospital, found Hawkes had no insight and poor judgment, and admitted her for further evaluation, therapy, and a trial of antidepressants (Tr. pp. 204-205). In March 1984, Hawkes was discharged from the hospital (Tr. pp. 202, 200). Testing on the WAIS-Revised showed a verbal IQ of 71, a performance IQ of 79,

and a full scale IQ of 73 (Tr. p. 203). Hawkes successfully completed training courses at the hospital to become a nurse's aid and a cook's helper, and was believed ready for employment (Tr. p. 203). It was noted that, prior to admission, Hawkes had been working part time at a church nursery school and part time at a Dairy Bar (Tr. p. 203). Hawkes was discharged to her parents, and had a discharge diagnosis of atypical psychosis and borderline intellectual functioning at Axis I, and histrionic personality features at Axis II (Tr. pp. 202-203). Hawkes was prescribed Mellaril (Tr. p. 203).

Hawkes was re-admitted to the hospital in January 1985 for bizarre and inappropriate behavior at home (Tr. pp. 200-201). Hawkes' family reported that, due to depression, the doctor at the Mental Health Center had doubled Hawkes' antidepressant, which caused Hawkes to feel confused (Tr. p. 200). It was noted that Hawkes had a twelfth grade education in special education classes, had worked as a sitter, and had previously been hospitalized from August 1983 through March 1984 (Tr. p. 200). Hawkes was discharged to her family in March 1985 because her family did not approve of Hawkes going on co-ed retreats; Dr. Kenneth Birchard's discharge diagnosis was atypical psychosis (Tr. pp. 198-199). Hawkes and her mother planned to set up a baby-sitting business (Tr. p. 199).

Hawkes was admitted to the hospital again in December 1985, again for bizarre behavior (Tr. p. 196). She was discharged in January 1986; D. John MacMahon diagnosed borderline intellectual functioning and noted her family was somewhat over-protective (Tr.

pp. 194-195).

In 1988, Hawkes was involved in a serious motor vehicle accident in which she sustained a near fatal head injury (Tr. p. 163).[2] Hawkes had a large left-sided intra cerebral hematoma; a craniotomy was performed and, after awakening from the coma and initial recuperation, she was sent for rehabilitation (Tr. p. 163). Hawkes was discharged from rehabilitation with severe impairments and needed assistance and re-education in all activities of daily living (Tr. p. 163). Hawkes continued to have seizures (Tr. p. 163).

In June 2004, Dr. Irina Bonnette diagnosed Hawkes with resolving right elbow cellulitis following a fall, advanced osteoporosis, confirmed by x-rays, a history of seizure disorder, for which she took Tegretol, Neurontin, and Depakote, and generalized deconditioning for which physical therapy was recommended (Tr. pp. 75).

Dr. Charles Leckie examined Hawkes in June 2004 for her complaints of a sudden onset of neck and lower back pain with an inability to walk (Tr. p. 185). Dr. Leckie noted Hawkes was 49 years old, had a history of a 1986 motor vehicle accident in which she suffered severe head trauma which resulted in a relatively mild traumatic brain syndrome, with reportedly full function physically and no recent seizures (Tr. p. 185). Hawkes' history also included

_____

[2] There are no medical records from the head injury, surgery, and rehabilitation in the administrative record. The history of the injury and treatment are set forth by Dr. Babson Fresh in his 2006 consultation report; Dr. Fresh was the surgeon who performed the 1988 craniotomy on Hawkes (Tr. p. 163).

intra cranial surgery (Tr. p. 186). Dr. Leckie also noted she was reliable as a caregiver for her father, but childlike in some aspects of expression; she spoke in short phrases but appeared to understand to some degree what was going on (Tr. pp. 185-186). Hawkes had a good grip and good foot flexion and dorsiflexion, but had difficulty standing, was unable to take the next step, and also had difficulty sitting upright due to discomfort. About six weeks previously, Hawkes had been treated in the emergency room for neck and back pain and was given Zosyn with dramatic improvement, then a rapid decline when she was discharged with just Augmentin, and improved again when a second agent was added (Tr. p. 185). After x-rays and an MRI, Dr. Lecke diagnosed paravertebral abscess, diskitis myelitis with compression or compressive effect on the spinal cord, and post traumatic brain syndrome (Tr. p. 187). Dr. Lecke prescribed Zosyn, a neurologic consult was set up, and Hawkes' therapy was continued (Tr. p. 187).

The neurologist, Dr. Aajjad Mueed, examined Hawkes in June 2004 and found she had a subacute spinal cord syndrome with weakness in the lower extremity which was fairly significant, as well as weakness of the upper extremities (Tr. p. 181). Dr. Mueed suspected a partially treated pyogenic abscess which had a focus in the lumber region, but could not rule out other etiologies including tuberculosis or fungal infection (Tr. p. 181). On discharge, Dr. Mueed noted that Hawkes had an urgent need for surgical intervention for her cervical spine and lumbar spine osteomyelitis and abscess, and transferred her to a Baton Rouge

hospital to see a spine surgeon (Tr. pp. 181, 184).[3]

Hawkes was found to have a hematogenously spread staph infection, that had adversely affected her cervical spine as well as other parts of her spine and skeleton (Tr. p. 163). Dr. Azaza in baton Rouge performed surgery for debridement of the infected bone, and a cervical fusion (Tr. p. 163).

Dr. Babson Fresh, a neurosurgeon, performed a consultative examination of Hawkes in May 2006; he was also the surgeon who performed the 1988 craniotomy on Hawkes, after the motor vehicle accident (Tr. p. 163). Dr. Fresh found no signs of infection, and stated that her main problem was that she was incapable of gainful employment (Tr. p. 163). Dr. Fresh noted that Hawkes has seizures, dizziness, impaired balance, memory problems, and cries often due to depression (Tr. p. 163). Dr. Fresh found her long-term memory appeared to be fairly good, although she did not recall much of her prior treatment by Dr. Fresh, her short term memory appeared to be fairly normal, and her affect was mildly abnormal (Tr. p. 164). Hawkes had a scar and probably burr holes from her pervious temporoparietal craniotomy, she had a full range of motion in her neck, she had normal strength in all four extremities, and normal and symmetrical sensory function in all four extremities (Tr. pp. 164-165). Hawkes had a normal upright gait without unsteadiness, ataxia, or limp, but tandem walking was mildly abnormal (Tr. p.

---

[3] There are no medical records from the Baton Rouge Hospital or the surgeon in the administrative record, but Dr. Babson Fresh gave a medical history in his 2006 consultation report (Tr. p. 163).

166).  Hawkes' reflexes were symmetrical (Tr. p. 165).  Dr. Fresh found that Hawkes suffers from a lifelong seizure disorder, a CT scan of her head confirmed residual areas of encephalomalacia[4] involving the left temporoparietal region and the right posterior thalamus, she has residual effects of traumatic brain disorder, and she has diminished mental capacity (Tr. p. 166).

In June 2006, Dr. James Quillin, a psychologist, evaluated Hawkes (Tr. p. 161).  Dr. Quillin noted that Hawkes was 57 years old, had previously lived with her parents, both deceased, and currently lived alone but her sisters attended her everyday and assisted her with daily activities, including managing her finances; Hawkes performed only very limited chores around the home, did not drive, and was "interdictive" (Tr. p. 161).  Dr. Quillin also noted her medical history, her stable depression, diminished appetite, low energy level, fleeting interests, episodic crying spells, and a work history assisting a private sitter several years ago (Tr. p. 161).  After a mental status exam, Dr. Quillin found Hawkes' overall intellectual efficiency was diminished, she had 0/3 immediate visual and verbal recall, she had left right confusion, she could follow 1/3 sequential commands, and her insight was poor, and her judgment functions were poor but fair to hypothetical situations (Tr. p. 162).  Dr. Quillin concluded

---

[4] Encephalomalacia is the softening of the brain due to degenerative changes in the nervous tissue.  MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Encephalomalacia, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

Hawkes has cognitive disorder, NOS secondary to remote TBI, probably depression secondary to her head injury, and an organic personality syndrome, and planned further testing (Tr. p. 162).

Dr. Quillin than administered the WAIS-III, which revealed substantial impairment (verbal IQ of 56, performance IQ of 65, and full scale IQ of 56, with her performance well below the first percentile relative to the general population. Dr. Quillin found Hawkes' performance IQ is substantially impaired, her vocabulary is adequate for very simple communication purposes only, she has a severe impairment with respect to verbal abstraction, a mild impairment with respect to nonverbal sequential or linear reasoning, her comprehension is quite compromised, her visuoconstructive function is reasonably intact on very simple tasks, but her performance on complex tasks is clearly mildly impaired, and she has substantial impairment in overall performance with function greater than three standard deviations below normal expectation (Tr. p. 158). Hawkes' global memory function studies (WMS III) showed moderate impairment (MQ of 45) with performance greater than three standard deviations below normal, immediate recall is greater than three standard deviations below normal, and auditory and delayed recall are three standard deviations below normal (Tr. p. 158). The Barona Formula placed Hawkes baseline at premorbid status probably squarely within normal limits (Tr. p. 158). Hawkes verbal learning and memory test (CVLT) showed her initial acquisition is mildly impaired while terminal acquisition is moderately to severely impaired, and stimulus recognition is at

only 44%, so Hawkes has difficulty not only with retrieval but with encoding (Tr. p. 158). The Bender Gestalt perceptual function studies revealed mild impairment (Tr. p. 158). The WCST executive function studies showed Hawkes is able to complete 0/6 categories in 128 trials, her performance relative to others matched for age and education is below the first percentile, and she has a severe perseverative and nonperseverative response tendencies (Tr. p. 158). Dr. Quillin concluded the Hawkes has a moderate neurocognitive impairment (Tr. p. 158), her performance on measures of general cognitive function as well as memory and new learning is great than three standard deviations below normal expectation, she has a severe impairment of executive function, and she has a mood disorder secondary to her head injury, with a correlated organic personality syndrome (Tr. p. 157).

### 2007 Administrative Hearing

At the administrative hearing, Hawkes testified that she lives across the street from her sisters, she does not have a telephone, but her sisters have one that she is allowed to use sometimes; Hawkes' sister, Charlotte Watson ("Watson"), testified that Hawkes does not now how to handle phone calls or use a telephone correctly (Tr. p. 224).

Hawkes testified that she was 52 years old, and finished high school in 1979 (Tr. p. 225). Hawkes testified that she attended the "real school" and graduated at age 24 (Tr. p. 227). Hawkes testified that her sister, Cathy, gives her medication (Tr. p. 225). Watson provided the ALJ with a list of Hawkes' current

13

medications, Carbatrol, Depakote, Diazepam, and Fluoxetine (Tr. p. 225; Tr. p. 161).[5]

Hawkes testified that she lived with her parents until they died (Tr. p. 226). Hawkes testified that she had seizures when she was a child and when she was in high school, and that she still has seizures (Tr. p. 227), and that she still takes medication for seizures (Tr. p. 228). Hawkes testified that her seizures were getting bad when she was in the car accident which injured her head and back (Tr. p. 228).

Hawkes' attorney explained that the medical records of Hawkes' seizures and head injury are not available anymore, nor are her school records, so the evidence of her childhood seizures, head injury, and brain surgery are by history (Tr. p. 229).

Hawkes did not recall who she worked for or whether she worked in 1980 (Tr. p. 229). Watson testified she is three years older

---

[5] Carbatrol is a medication used to treat epilepsy seizures. MEDLINEplus Health Information, Drug Information: Carbatrol, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster (a service of the U.S. National Library of Medicine and the National Institutes of Health). Depakote is also used to treat seizures. MEDLINEplus Health Information, Drug Information: Depakote, *available at* http://www.nlm.nih.gov/ medlineplus/druginfo/ medmaster (a service of the U.S. National Library of Medicine and the National Institutes of Health). Diazepam is used to relieve anxiety, muscle spasms, and seizures. MEDLINEplus Health Information, Drug Information: Diazepam, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster (a service of the U.S. National Library of Medicine and the National Institutes of Health). Fluoxetine is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. MEDLINEplus Health Information, Drug Information: Fluoxetine, *available at* http:// www.nlm.nih.gov/medlineplus/druginfo/ medmaster (a service of the U.S. National Library of Medicine and the National Institutes of Health).

than Hawkes and she lived in the same household as Hawkes until Watson married at age 20 (Tr. p. 230). Watson testified that, when Hawkes was 20 years old, she was taken out of special education school and told she had to take a certificate, but Hawkes insisted on attending high school (Tr. pp. 230-231). Hawkes managed to finish high school with assistance from Watson, Watson's husband (who was a tutor), and her teachers (Tr. pp. 230-231, 240).

Watson testified that, when Hawkes was three years old, Hawkes had a seizure that was so bad, she was taken to the hospital to be pronounced dead; although she was revived at the hospital, her brain was deprived of oxygen for so long that she had brain damage and learned things more slowly that others her age from then on (Tr. p. 231). Hawkes has had seizures periodically from the time she was born (Tr. p. 232). Watson testified Hawkes sometimes had four or five grand mal seizures a day until she was prescribed Valium; now she does not have seizures as often (Tr. p. 232). Watson testified that Hawkes had seizures when she was 18 and 19 years old, and that she was taken to a doctor in Shreveport, who gave her medicine which did not help (Tr. p. 232). Watson testified they have been unable to locate that doctor (Tr. p. 232).

Watson testified that, when Hawkes was 18 through 22 years old, she had grand mal seizures which caused her to lay on the floor and turn blue until someone gave her medication (Tr. p. 232). Watson testified that Hawkes had usually had three or four grand mal seizures a month (Tr. p. 233). Watson further testified that Hawkes never went a month without having at least one seizure, and

usually had more than one per month (Tr. pp. 256-257).

Watson testified that Hawkes never lived by herself and did not cook (Tr. pp. 233, 241). Watson also testified that, besides working for family members, Hawkes has only worked as a sitter for friends (Tr. p. 233). Watson testified that Hawkes' income of $8700 in 1981 was probably from sitting with Wanda White's mother, who was disabled; Hawkes helped another sitter take Wanda White's mother to the bathroom, feed her, and change her bed, under the other sitter's supervision (Tr. p. 233-234). Hawkes worked five days a week, for about six hours a day (Tr. p. 236). Watson testified that she was not aware of any instance in which Hawkes stayed by herself with Wanda White's mother, except when the other sitter had to go to the store across the street (Tr. pp. 234, 236). Hawkes and Watson both testified that Wanda White's daughter was the main sitter and was always present when Hawkes sat with White's mother (Tr. pp. 234, 236). Watson testified that, although Hawkes was paid $8700 in 1981, Hawkes did not actually do much work because she was the assistant sitter, and she did not make any decisions or give medicine (Tr. pp. 234-236). Watson testified that Wanda White was a friend of their father's who was trying to help him because he was supporting Hawkes (Tr. p. 235). Watson testified that Hawkes worked for Wanda White for a little more than one year, until White's mother passed away (Tr. p. 235).

Watson testified that, in 1983, Hawkes earnings of $5800 (and possibly her 1984 earnings of $3400) were probably from sitting with "Mr. Denney" after he went home from the hospital; Hawkes

16

assisted Denney's wife with things like taking him to the bathroom and getting his meals (Tr. p. 237). Watson testified that Denney's elderly wife had trouble taking care of him by herself, and Denney needed help getting in and out of bed (Tr. p. 237). Hawkes would read Denney a book or get him a magazine and perform other menial tasks (Tr. p. 238). Denney's wife was always present when Hawkes was working (Tr. p. 237). Watson testified that the Denneys were friends of her father's, so they hired Hawkes to help them until Mr. Denney was able to get around unassisted (Tr. pp. 237-238). Watson testified that Hawkes worked for the Denney's for maybe one year or a little less (Tr. p. 237).

Watson also testified that Hawkes worked for one of their cousins for one year, washing milk cans at the dairy barn; Hawkes earned $3 per day, six days a week, working 1 ½ hours per day (Tr. p. 238). Watson testified that Hawkes has never worked for anyone but family members and friends (Tr. p. 238). Watson testified that Hawkes has not worked since the 1980's, and the people she used to work for (including their cousin) have all died (Tr. p. 239).

Watson and Hawkes testified that Hawkes was admitted to Central State Hospital twice in the 1980's (Tr. p. 241). Watson also testified that, when Hawkes was 18 to 22 years old, she always had to have supervision and help with everything she did, she could not be alone, and she never did anything for herself, such as selecting her clothing every day, making sure she ate her breakfast, making sure she had lunch money and registered with her teacher that she had it (since she tended to give it away), make

17

sure she had everything she needed for school every day, and check that she brought everything back home from school every day (because she tended to give her things away).

Another witness for Hawkes, Liz Brooken,[6] testified that she had known Hawkes all her life because Charlotte and Cathy Watson were friends of hers (Tr. pp. 243-244). Brooken testified that Hawkes was employed in 1981 through 1983 as an assistant sitter; Hawkes would assist with such things as lifting the person and getting things (Tr. p. 244). Brooken testified that Hawkes was always supervised and did not sit with people by herself (Tr. pp. 244-245). Brooken recalled Hawkes sitting with Mrs. White and Mr. Denney in the early 1980's (Tr. p. 245). Brooken testified that Hawkes always had another sitter with her because she was incapable of doing the job by herself; she had trouble making decisions and she was unreliable, although she was willing to help (Tr. p. 246). Brooken testified that Hawkes' earnings were "gratuitous" because friends and family who were willing to tolerate the situation tried to help Hawkes and her parents financially by employing Hawkes (Tr. p. 246-247). However, her employers knew Hawkes needed assistance at work, she was not responsible enough and did not have the intellectual capacity to take care of someone else all day by herself, and she was subject to having seizures (Tr. p. 246).

Brooken also testified that Hawkes was in special education when she was growing up, and then struggled to complete high school

---

[6] The administrative transcript has the name "Brooken" for the witness, but the claimant's brief shows her name was really "Brookings."

18

(Tr. p. 247). Brooken testified that, when Hawkes was between 18 and 22, she functioned, could carry on a conversation, could write and do easy addition, and could do "daily things," but she could not reason and she always had a problem deciding what to wear that was appropriate for the time of year (Tr. pp. 247-248). Brooken further testified that, if someone sent Hawkes to the store to buy milk with $10, Hawkes may not get the right kind of milk, may get expired milk, and may not get the right amount of change, because her ability to reason was impaired (Tr. p. 248). Brooken did not recall Hawkes ever going anywhere on her own or going out to do something by herself (Tr. pp. 248-249).

Cathy Watson, another sister of Hawkes, testified that Hawkes has never been able to go to the store on her own or get out and do things on her own, without having someone with her to supervise her (Tr. pp. 249-250). Cathy Watson testified that their mother, father, or one of the sisters always went with Hawkes because she might not remember how to get back home (Tr. p. 249). Although there was a store across the street from where they lived, Hawkes was not allowed to cross the street because it was a busy highway (Tr. p. 249). Cathy Watson also testified that, if Hawkes was told to buy groceries, she would buy ice cream, popsicles, cookies, and other things she likes to eat instead of things she needs to eat (Tr. p. 250).

Cathy Watson testified that Hawkes' head injury from the 1988 car accident made her seizures a little worse (Tr. p. 250). Cathy Watson testified that Hawkes was a passenger in a car that was

19

struck by a large, loaded truck, and that Hawkes sustained broken ribs, a broken ankle, and a head injury (Tr. p. 251). After spending several months in rehab, Hawkes' family had to care for her (Tr. p. 251). Cathy Watson testified that Hawkes had an eating disorder after the accident, but she did not really have a cognitive injury from the accident (Tr. pp. 251, 253).[7] Hawkes' attorney stated he had obtained all of the older medical records that still exist (Tr. p. 253); there are no medical records from the 1988 accident in the administrative record.

In response to questions from the ALJ, the VE testified that Hawkes' seizure disorder alone, if it was controlled and seizures did not occur, would not significantly limit her ability to perform unskilled work (Tr. p. 255). The VE further testified that the occurrence of occasional seizures would critically affect whether she would be hired, although they would not be significant functionally (Tr. p. 256). The VE testified that Hawkes could work in food service, domestic type housekeeping, or laundry cleaning (Tr. p. 256). However, the VE also testified that the majority of employers would be "very skittish" about hiring someone who suffered from at least one seizure per month, and probably would not hire such a person (Tr. p. 257). The VE testified that suffering from seizures would disqualify someone from working as a primary sitter (Tr. p. 258).

### ALJ's Findings

To determine disability, the ALJ applied the sequential

---

[7] Page 252 of the administrative transcript is missing.

process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Hawkes (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Hawkes has not engaged in substantial gainful activity since 1982, her work at that time was not proven to be subsidized (Tr. p. 14), her disability insured status expired on June 30, 1984 (Tr. p.1 4), and that she had "medically determinable" impairments of atypical psychosis and

21

borderline intellectual functioning prior to age 22 which were "not severe" (Tr. p. 15). The ALJ further found there was no medical evidence to substantiate the claim that Hawkes suffered from a seizure disorder prior to the accident in 1988 (Tr. p. 15). The ALJ concluded that, prior to attaining age 22 and prior to her date last insured, the claimant did not have an impairment or combination of impairments that significantly limited her ability to perform "basic work-related activities" for twelve consecutive months and, therefore, did not have a severe impairment or combination of impairments (Tr. p. 16). The ALJ thus ended the five step analysis at Step 2, with a finding that Hawkes did not suffer from any severe impairments prior to her attainment of age 22 (on March 8, 1977) and prior to her date last insured (June 30, 1984), and therefore was not disabled as defined in the Social Security Act (Tr. p. 18).

## Law and Analysis

Hawkes contends the ALJ erred in failing to find she was disabled prior to her twenty-second birthday (March 9, 1977), and prior to her date last insured (June 30, 1984). Hawkes contends the ALJ committed reversible error by failing to find that Hawkes suffered from a severe intellectual impairment prior to age 22, despite valid IQ scores of 71 verbal IQ, 79 performance IQ, and 72 full scale IQ. Hawkes points out that the ALJ failed to recognize Hawkes' limited intellectual functioning as an impairment. Hawkes also argues the ALJ erred in failing to give weight to the collateral source evidence of her seizure disorder, and that the

22

ALJ erred in finding her atypical psychosis was not severe for a period of twelve continuous months.

## Severity and Duration of Hawkes' Impairments

First, Hawkes contends the ALJ erred in failing to find that Hawkes suffered from a severe impairment, prior to age 22 (for her DAC claim), due to limited intellectual functioning, despite valid IQ scores of 71 verbal IQ, 79 performance IQ, and 72 full scale IQ.

Hawkes also contends the ALJ erred in failing to find she suffered from severe atypical psychosis prior to expiration of her DIB insured status after June 30, 1984.

The ALJ found that, although Hawkes suffers from "medically determinable impairments" of atypical psychosis and borderline intellectual functioning, those impairments were not severe impairments, either prior to age 22 or prior to June 30, 1984, because they did not significantly limit her ability to perform basic work-related activities for twelve consecutive months (Tr. p. 15).

The ALJ applied the incorrect standard to his determination of whether Hawkes has "severe" impairments. In Stone, the Fifth Circuit noted that an impairment can be considered as not "severe" only if it is a slight abnormality which has such a minimal effect on the claimant that it would not affect his ability to work, and construed that to mean that some impairments are so slight that the ability of the claimant to work can be decided without a full evaluation of vocational factors. The factfinder is entitled to follow a sequential process that disposes of those cases at that

23

early stage.  The Fifth Circuit concluded that it would in the future assume the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to the <u>Stone</u> opinion or another of the same effect, or by an express statement that the construction the Fifth Circuit gave to 20 C.F.R. § 404.1520(c) (1984) is used.  Unless the correct standard is used, the claim must be remanded to the Commissioner for reconsideration.  <u>Stone</u>, 752 F.2d at 1106.  Also, <u>Loza v. Apfel</u>, 219 F.3d 378, 390-392 (5th Cir. 2000).

In <u>Loza</u>, the Fifth Circuit found that, in determining the severity of the claimant's mental impairment, the ALJ erroneously applied his own standard involving a slight restriction in activities of daily living, instead of the Fifth Circuit's standard based on a slight abnormality having such minimal effect as would not be expected to interfere with the ability to work, irrespective of age, education or work experience.  Similarly, in the case at bar, the ALJ erroneously used his own standard involving the four broad functional areas set out in the disability regulations for evaluating mental disorders and in Listing12.00C, and found Hawkes's mental impairments were "not severe" because she had only "mild" limitations in daily living, social functioning, and concentration, persistence and pace, and a moderate limitation in "episodes of decompensation."[8]  The ALJ did not mention or apply

---

[8] Moreover, the ALJ inappropriately made the mental health assessment himself, instead of relying on medical records or a medical consultant.  ALJ's have been warned by the courts against "playing doctor" and making their own independent medical assessments.  <u>Frank v. Barnhart</u>, 326 F.3d 618 (5th Cir. 2002).

the <u>Stone</u> standard.

Additionally, the ALJ found Hawkes was not entitled to DIB for her atypical psychosis because she did not suffer from it for twelve continuous months.  In analyzing the severity of Hawkes' atypical psychosis for purposes of her DIB claim, the ALJ used the "C criteria" in Listing 12.00 (episodes of decompensation) to find Hawkes had been treated for one episode of  atypical psychosis which lasted less than twelve months.  The ALJ also noted that Hawkes completed job training at the hospital and left there "ready to work" (Tr. pp. 17-18).  Hawkes contends the ALJ found she had not proven she suffered from atypical psychosis for twelve continuous months, since she was only in the hospital for seven months prior to expiration of her DIB insured status.  Although Hawkes points out that she was re-admitted to the hospital in January 1985, that was after expiration of her DIB status. However, the ALJ appears to have confused "episodes of decompensation" with the mental illness called atypical psychosis, of which episodes of decompensation are one possible symptom.  See Listing 12.02; <u>DSM-IV</u>, Classification 298.9, "Psychotic Disorder Not Otherwise Specified," p. 343.  Therefore, the ALJ did not correctly analyze the duration and severity of atypical psychosis.

The ALJ clearly erred in his analysis of the severity and duration of Hawkes' impairments.  Therefore, substantial evidence does not support the ALJ's/Commissioner's conclusions that Hawkes did not suffer from any severe impairments prior to age 22 and prior to the expiration of her disability insured stated after June

30, 1984.

Seizure Disorder

Hawkes also argues the ALJ erred in failing to give weight to the collateral source evidence of her seizure disorder and in failing to find she suffered from a seizure disorder prior to her 1988 automobile accident. The ALJ noted in his decision that Hawke's sisters and family friend testified as to the fact that Hawkes suffered from grand mal seizures prior to age 22. However, the ALJ mis-stated Charlotte Watson's testimony, stating she testified Hawkes had four to five grand mal seizures a day between the ages of 18 and 22 (Tr. p. 15). In fact, Charlotte Watson testified that Hawkes Watson testified Hawkes sometimes had four or five grand mal seizures a day as a very young child, until they were controlled with Valium (Tr. p. 232). Charlotte Watson further testified that Hawkes always had at least one seizure a month, and usually had three to four seizures a month (Tr. pp. 233, 256-257). The ALJ further stated (Tr. p. 15):

> "[t]he evidence does not substantiate the claimant and her sister's assertions. Rather, the record shows that the claimant's seizure activity is the result of a car accident that occurred in 1988, after the claimant attained the age of-two and after the claimant's date last insured. (Exhibit 3-F). The record contains no evidence of seizure activity prior to the automobile accident. In fact, the claimant was admitted to Central State Hospital in 1983 and these records do not reflect any history of seizure activity. Physical examination on admission revealed no physical findings and the claimant was not taking any medication for seizures."

The ALJ relied on Central State Hospital medical records from August 16, 1983, through January 1986, for his findings (Tr. pp. 194-205). Those are the only medical records in the administrative

26

record which pre-date Hawkes' 1988 accident and traumatic brain injury, although they are after Hawkes' twenty-second birthday. The record from Hawkes' hospitalization in August 1983-March 1984 does not reflect that Hawkes suffered from a seizure during her stay or that she was taking seizure medication. The record from Hawkes' January 1985 through March 1985 hospitalization shows, in the "past medical history" section, that Hawkes denied having had any seizures or brain trauma; no seizures were noted during Hawkes' hospitalization. Hawkes' medical record from her December 1985 through January 1986 hospitalization also did not show she suffered any seizures during her stay. There are no further medical records for Hawkes until 2004. However, Dr. Babson Fresh, the neurosurgeon who perform the surgery on Hawkes' brain after the motor vehicle accident, stated he had performed that surgery and that Hawkes had suffered seizures before the surgery; Dr. Fresh does not state whether he was told of Hawkes' seizures by way of her medical history, whether he had seen medical records of seizures which predated the accident or saw pathology in surgery, or whether he knew of the seizures before the accident because he had treated Hawkes for them. Other medical records, pre-dating Hawkes' social security applications but subsequent to her accident, indicate Hawkes has a history of seizures since childhood.

The ALJ mis-stated the medical evidence when he concluded that Hawkes' seizures are the result of the car accident; there is no direct medical evidence indicating when her seizures started - either before or after the accident. The ALJ discredited the

27

testimony of Watson and Brooken that Hawkes' seizure disorder began in childhood, based on his erroneous finding that the medical evidence established that Hawkes' seizures began after the car accident. In this instance, the ALJ's credibility determination , based on an error of fact, is not entitled to deference. On remand, the evidence as to whether Hawkes' suffered from seizures prior to the car accident should be re-evaluated.

Therefore, substantial evidence does not support the ALJ's determination that Hawkes' seizures did not begin until after her accident.

Remand

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law as to Hawkes' DAC and DIB applications. However, this does not entitle Hawkes to a decision in her favor based upon the existing record. The record is simply inconclusive as to whether Hawkes was under a disability as defined by the Social Security Act, given her true impairments. Therefore, Hawkes' claims should be remanded to the Commissioner for further consideration of the severity of *all* of her mental impairments, as well as re-evaluation of Watson's and Brooken's testimony as to whether Hawkes suffered from seizures prior to the 1988 car accident.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Hawkes' appeal be GRANTED, the final decision of the Commissioner

be REVERSED, and Hawkes' claims be REMANDED to the Commissioner for further proceedings consistent with the views expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 15th day of December, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

29